## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HOLLY WIER,

        Plaintiff,

   v.

UNITED AIRLINES, INC.,

        Defendant.

No. 19 CV 7000

District Judge Chang

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Holly Wier's motion to compel the production of certain documents listed on Defendant United Airlines, Inc.'s privilege log, or alternatively, for an *in camera* review. [57].[1] For the reasons that follow, Wier's motion is denied.

### Background

Holly Wier has sued her former employer, United Airlines, Inc. ("United"), claiming failure to accommodate, discrimination, and retaliation under the Americans with Disabilities Act ("ADA") and the Illinois Human Rights Act ("IHRA"), as well as interference, discrimination, and retaliation under the Family Medical Leave Act ("FMLA"). [1].

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

Wier began working for United in December 1994.[2] [*Id.*] 2, ¶ 6. She worked in the company's Network Operations – Pilot Training Scheduling department.[3] [82] 2. According to Wier's Complaint, she applied for and received intermittent leave under the FMLA to care for her mother, who had a stroke in November 2015. [1] 3, ¶¶ 11–12. Wier used "approximately one day of leave" before her mother's death in March 2016. [*Id.*] 3, ¶ 12. About six months later, in September 2016, Wier requested intermittent FMLA leave covering August 2016 through August 2017 in order to attend therapy appointments and take care of her health condition (anxiety and depression). [*Id.*] 3, ¶¶ 13–14. Wier claims that United "repeatedly" requested medical documentation beyond that required by the FMLA, but ultimately approved her request in October 2016. [*Id.*] 3, ¶¶ 15–16. In July 2017, Wier sought an additional six months of intermittent FMLA leave, which United approved for the period of August 15, 2017 through February 15, 2018. [*Id.*] 3, ¶¶ 17–18.

Wier claims that, in early August 2017, United began investigating her use of FMLA leave and the timing of her absences. [57] 1. As part of that investigation, Wier claims that United reviewed her Facebook account and compared her absences to the work schedule of her then-fiancé—another United employee. [*Id.*]. According to Wier, sometime in September 2017, United "formed the belief" that her therapist's license

---

[2] According to United's Answer and Affirmative Defenses to Plaintiff's Complaint, Wier "was employed by United in Chicago, Illinois between December 5, 1994 and October 21, 2008, and again between November 9, 2011 and October 27, 2017." [15] 3.

[3] Based on the record before the Court, it is unclear whether Wier was employed within this department for the entirety of her employment with United. United's written discovery responses, which were filed in connection with a prior discovery dispute, indicate that Wier worked within this department for at least the period of January 1, 2013 to October 31, 2017. [82] 2.

had been cancelled or not renewed. [*Id.*]. Wier claims that, on September 25, 2017, someone in the company's medical department contacted her therapist and asked the therapist to confirm that she had completed Wier's FMLA paperwork certifying her need for leave. [*Id.*] 1–2; [1] 4, ¶ 19. Wier claims that she received a letter from United on October 5, 2017, which advised that additional information was needed for her FMLA certification, as her therapist's license had been cancelled or not renewed—a fact of which Wier claimed to be "completely unaware." [1] 4, ¶¶ 22–23; [57] 2. After speaking to her therapist, who informed her that she had recently discovered that she had allowed her license to lapse a year earlier, Wier contacted United's medical department to share this information and ask whether her primary care physician could submit another FMLA certification. [57] 2; [1] 4, ¶ 24. A representative from the department advised that she could. [1] 4, ¶ 25. Wier's primary care physician sent a new FMLA certification to United on October 16, 2017. [*Id.*] 4, ¶ 26.

Wier alleges that, the next day, United managers—including the Human Resources Senior Manager, the Pilot Crew Scheduling Manager, and a Pilot Crew Scheduling Supervisor—called her into a meeting and "interrogated and berated her about her use of FMLA leave over the past two years." [*Id.*] 4, ¶ 27; [57] 2. According to Wier, "Defendant purported to be concerned about [her] 'dependability' and her 'misuse of FMLA time.'" [1] 4, ¶ 28. Wier claims that, on October 26, 2017, she received a letter from United stating that her employment was terminated because it was "unlikely" that she was unaware her therapist's license had lapsed and she had "admittedly committed fraud" by completing the FMLA paperwork herself to

3

have her claim approved. [*Id.*] 5, ¶ 30. Wier claims that United's stated reason for terminating her employment is pretextual. [*Id.*] 6, ¶ 41.

The instant dispute concerns the sufficiency of United's privilege log. United produced its initial Privilege Log on March 24, 2020. [57-2] 1–9. Plaintiff's counsel sent a letter on August 25, 2020, addressing alleged deficiencies in the log. [57] 2. Counsel met and conferred over the phone on September 10, 2020, and thereafter exchanged letters on September 15, September 30, and October 13. [*Id.*] 2–3. United tendered a Revised Privilege Log on October 19, 2020. [*Id.*] 3; [57-2] 10–25. The next day, Plaintiff's counsel sent another letter regarding purported deficiencies with that log. [57] 3. Counsel again met and conferred over the phone on October 29, 2020, and Plaintiff's counsel sent a follow-up letter that same day. [*Id.*]. According to Wier, on November 6, 2020, her counsel demanded that United produce what Wier believed to be erroneously withheld documents and made multiple requests to discuss the matter over the phone between mid-November and early December. [*Id.*]. United produced a Second Amended Privilege Log on December 18, 2020.[4] [*Id.*]; [57-2] 26–43. The parties met and conferred via telephone on December 22, 2020, and Plaintiff's counsel sent a letter regarding that conversation later that day. [57] 3.

Additionally, Plaintiff's counsel's December 22 letter notified United that Wier intended to rely on a "subject-matter waiver argument" as to UNITED000177—a document included in United's document production—in a forthcoming motion to

---

[4] In her motion, Wier states that this log was tendered on December 17, 2020, [57] 3, but the log is dated December 18, 2020. [57-2] 42–43.

compel. [57] 3, 11; [68] 4, 12. The following day, defense counsel emailed Plaintiff's counsel a letter, stating that, based on Plaintiff's counsel's letter, United was now aware that an email communication that should have been withheld based on the attorney-client privilege was inadvertently included in United's initial production. [68] 12, 23. United also included a Third Amended Privilege Log, adding two emails from UNITED000177 and reformatting the log to list entries in chronological order "for ease of review."[5] [*Id.*] 24; [57-1].

On January 4, 2021, Wier filed the instant motion to compel, requesting that the Court compel the production of thirty-five documents on United's fifty-entry privilege log, or alternatively conduct an *in camera* review. [57]. The disputed documents consist of twenty-eight emails (entries 1–2, 4–29) and one attachment (entry 3) sent between August 25, 2017 and November 2, 2017, as well as six summaries of communications listed on an internal company spreadsheet (entry 50).[6] [57-1]. The email participants include United's in-house counsel Sean Nash, management employees from United's Employee Services Center (hereinafter "ESC", which is the department responsible for administering FMLA), Human Resources employees, and managers/supervisors who were involved in the administration of or investigation into Wier's FMLA use and certification. [68] 2–4. In addition, some

---

[5] Wier claims that the Third Amended Privilege Log contains additional changes from the prior log version. [57] 3 n.2. Because the Third Amended Privilege Log is the subject of the instant dispute, the Court addresses only that log.

[6] Each of the six descriptions incorporated in entry 50 is included on a single spreadsheet that was filed under seal. [58-1]. For uniformity, the Court uses the term "documents" as a general descriptor for the spreadsheet entries.

emails include a group email for the Operations Center Medical Department ("OPCMD")—a department within ESC comprised of nurses who administered FMLA for Wier's department. [*Id.*] 2–3. After the motion was fully briefed, the Court heard oral arguments on March 25, 2021. [87].

### Legal Standard

"The attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). The privilege exists to protect "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Babych v. Psychiatric Sols., Inc.*, 271 F.R.D. 603, 610 (N.D. Ill. 2010) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)). "To determine if a communication falls within the protection of the attorney-client privilege, we ask: (1) whether legal advice of any kind was sought from a professional legal adviser in his capacity as such; and (2) whether the communication was related to that purpose and made in confidence by the client." *Sandra T.E.*, 600 F.3d at 618 (citing *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997)) (internal quotations omitted). "The burden falls on the party seeking to invoke the privilege to establish all the essential elements." *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991) (citation omitted).

"[I]n the corporate context, the attorney-client privilege extends only to an employee who communicates with counsel at the direction of corporate superiors

regarding matters within the scope of the employee's duties for the purpose of securing legal advice." *United States ex rel. McGee v. IBM Corp.*, No. 11 C 3482, 2017 WL 1232616, at *2 (N.D. Ill. Apr. 4, 2017) (citing *Upjohn*, 449 U.S. at 394). "Communications in which counsel is not a sender or recipient may also be privileged if they reveal, directly or indirectly, the substance of a confidential attorney-client communication." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15 C 3187, 2020 WL 3977944, at *2 (N.D. Ill. July 14, 2020) (internal quotations and citation omitted); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 433 (N.D. Ill. 2006); *Heriot v. Byrne*, 257 F.R.D. 645, 665–66 (N.D. Ill. 2009).

Federal Rule of Civil Procedure 26 provides that a party withholding information otherwise discoverable on privilege grounds must "expressly make the claim" and "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A); *see also* 6 James Wm. Moore et al., Moore's Federal Practice § 26.47[1][b] (3d ed. 2021) ("Generally, a privilege log is adequate if it identifies with particularity the documents withheld, including their date of creation; author, title or caption; addressee and each recipient; and the general nature or purpose for creation.").

Whether to conduct an *in camera* review to assess privilege claims is within the court's discretion. *McGee*, 2017 WL 1232616, at *3; *Washtenaw Cnty.*, 2020 WL 3977944, at *3.

## Discussion

Wier argues that United has improperly withheld or redacted thirty-five documents on United's Third Amended Privilege Log on four grounds. Wier claims that these documents are not protected by the attorney-client privilege because (1) no legal advice was sought or (2) they were not made in confidence. Alternatively, even if the privilege would have otherwise applied under the first two grounds, United waived any such privilege by (3) asserting certain affirmative defenses or (4) producing the communications. [57] 2.

## I. Choice of Law

At the outset, the Court addresses an issue raised by the parties: whether state or federal privilege law governs the instant dispute. "In federal court, privileges, including [the] attorney-client privilege, are governed by federal common law, except that privileges are determined by state law for an element of a claim or defense as to which state law provides the rule of decision. *Babych*, 271 F.R.D. at 608 (citing Fed. R. Evid. 501). "The rule, by its terms, is claim-specific; the governing law of privilege depends on what claim or defense is at issue." *Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 WL 2179170, at *1 (N.D. Ill. June 1, 2010).

Wier's motion begins from the premise that Illinois privilege law applies and cites case law from this district purportedly standing for the proposition that where the material sought in discovery relates to both state and federal claims, the narrower privilege law should apply. [57] 7; [73-1] 2. United disagrees and argues that federal privilege law applies, as the dispute is "in federal court based on the presence of a

federal question . . . and the court exercised supplemental jurisdiction over [Wier's] nearly identical state law claims." [68] 8. According to United, "[t]he fact that the materials sought may also relate to [Wier's] state law claims, does not make state privilege law applicable." [*Id.*] (citing *Babych*, 271 F.R.D. at 609).

The Court agrees with United that federal privilege law applies in this case. Wier's reliance in her reply brief on *Motorola* is misguided. Wier claims that *Motorola* effectively evidences a preference for the narrower privilege law (state or federal) in cases where both types of claims exist and for which documents are sought that relate to both. [73-1] 2. But that is not what *Motorola* held, nor did the *Motorola* court even have to reach that question. While the *Motorola* court ultimately applied Illinois privilege law, it did so because the claim to which the documents at issue related was a state-law claim. 2010 WL 2179170, at *2.

The *Motorola* court noted that it had not found any decisions addressing "what law applies when the evidence applies to both federal and state claims and state law applies narrower privilege protection"—the situation before this Court. *Id.* The court explained that Motorola, while arguing for the application of federal privilege law, had made no showing, or even attempt to show, that any of the material on which it asserted privilege concerned the federal claims in the case. *Id.* The court further explained, "Indeed, the issue regarding privilege first arose in connection with litigation over [a defendant's] counterclaim under the Illinois Whistleblower Act, a state-law claim. There is no suggestion that the privilege issue relates to any claims other than that one." *Id.* For those reasons, the court determined that Motorola's

opponents had "the better of the argument and that Illinois privilege law governs." *Id.*

The court in *Motorola* did not find, as Wier suggests, that Illinois privilege law governed *because* it provided more narrow protection than federal law. At the March 25, 2021 motion hearing, Wier's counsel correctly noted that the attorney-client privilege should be narrowly construed (*see, e.g.*, *McGee*, 2017 WL 1232616, at *1), but incorrectly reaffirmed the contention in Wier's reply brief that *Motorola*'s contribution to that narrow construction is essentially a "tie goes to the narrower" doctrine. [90] 44. *Motorola* does not say this.

Another decision in this district, to which United cites, explains why Wier's reading is erroneous. In *Babych*, the plaintiff's case was removed to federal court because the Age Discrimination in Employment Act, Fair Labor Standards Act, and FMLA claims provided federal question jurisdiction, and there was supplemental jurisdiction over the plaintiff's corresponding state law age discrimination and wage claims. 271 F.R.D. at 609. The court addressed the application of state versus federal privilege law, stating:

> Under [Federal Rule of Evidence] 501, the federal common law of privilege is to be applied, except with respect to an element as to which state law supplies the rule of decision. In this case, state law *alone* does not supply the rule of decision as to Babych's age discrimination and wage claims; federal law governs some of those claims and, thus, the federal law of privilege applies to those claims. Although applying federal privilege law has, in other cases, resulted in a narrower scope of privilege, nothing in Rule 501 suggests that the result (narrower or broader privilege) is a factor in choosing the law to be applied.

*Id.* The court explained, "The federal common law of privilege applies to the disputed materials because they relate to the federal claims. That they also relate to the corresponding state law claims does not make the state privilege law applicable because it would be meaningless to hold the communication privileged for one set of claims and not the other." *Id.* (internal quotations and citation omitted); *see also* Moore et al., *supra*, § 26.47[4] (explaining that in federal question cases containing state law claims, "any asserted privileges relating to evidence relevant to both state and federal claims are governed by federal common law"). The court in *Babych* found that the Senate Report on Federal Rule of Evidence 501 further supported this result: "It is also intended that the Federal law of privileges should be applied with respect to pendant [*sic*] State law claims when they arise in a Federal question case." *Id.* (citing S. Rep. No. 93–1277, at *7059 n.16 (1974)).

The instant case is akin to *Babych*. Wier's Complaint alleges that her ADA and FMLA claims confer federal question jurisdiction and that supplemental jurisdiction exists over her IHRA claims. [1] 2, ¶ 2. Wier claims that United "has failed to show that the material on which it claims privilege concerns only Plaintiff's federal claims." [73-1] 2. That is not the test. All that is required is that the material concern federal claims for federal privilege law to apply—it need not do so exclusively. Wier concedes that the disputed material "almost certainly relates to both Plaintiff's state and federal claims, which Defendant describes as 'nearly identical.'" [*Id.*]. The federal law of privilege thus governs.

## II. Attorney-Client Privilege

Wier claims that, even applying federal privilege law, United has not carried its burden to establish that the thirty-five disputed documents are privileged. Wier claims that United has failed to establish that (1) legal advice was sought in these emails, particularly where United's in-house counsel was merely copied; and (2) the emails were made in confidence, especially where in-house counsel was "but one of a larger group to which the emails were directed." [73-1] 3.

### A. Legal Advice Sought

Wier argues that none of the documents at issue reflect a request for legal advice. In support, Wier points out that some emails do not feature an attorney sender or recipient.[7] [57] 5–6. In other emails, Wier notes that counsel was only copied, "thus calling into question whether they were sent to seek legal advice."[8] [57] 6. And in others, Wier states that counsel was one of multiple direct recipients, "giving rise to the suspicion that the sender was not seeking legal advice, but for all intents and purposes simply adding the attorney to the correspondence in the manner of a copy." [*Id.*]. Finally, Wier acknowledges that some emails were sent by counsel, but maintains there is no evidence that counsel was "responding to a prior confidential

---

[7] Wier states that there are ten documents that were withheld or redacted, including entries 5, 7, 23, 24, and 50, that did not involve an attorney sender or recipient. [57] 5–6 (entry 50 incorporates all six spreadsheet summaries, as explained above). However, entry 5 is an email from Sean Nash, United's in-house counsel, and entry 7 is an email on which Nash was copied. [57-1] 3.

[8] The Court notes that entry 6 does not delineate the To/CC recipients. At the motion hearing, the Court asked United's counsel to clarify this point, and counsel explained that, on its face, the email does not break down the recipients in the "To" line versus the "CC" line.

communication seeking legal advice."[9] [*Id.*]. In sum, Wier claims that "[t]he vast majority of the communications at issue are email chains where non-attorneys are initiating and responding to emails to and from other non-attorneys. These simply do not evidence the requisite solicitation of legal advice." [73-1] 3.

Wier's arguments ignore the fact that "the privilege issue is not settled by authorship or participation." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. at 433.

*First*, Wier suggests that the absence of counsel on certain emails casts doubt on the applicability of the privilege. "[C]ommunications between non-lawyer employees often warrant protection from disclosure." *Crabtree v. Experian Info. Sols., Inc.*, No. 16 C 10706, 2017 WL 4740662, at *2 (N.D. Ill. Oct. 20, 2017) (citing *Heriot*, 257 F.R.D. at 665. "The question is whether the communications rest on confidential information obtained from the client, or would reveal the substance of a confidential communication by the client." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. at 433. The emails need only "reveal, directly or indirectly, the substance of a confidential attorney-client communication." *Id.* (citations omitted); *Heriot*, 257 F.R.D. at 666.

The problem with these employee-to-employee emails is not the lack of counsel but the lack of specificity in the document descriptions. A privilege log must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).

---

[9] Wier states that three emails—entries 26, 28, and 29—were sent by Nash. [57] 6. Wier is correct that the disputed emails include three entries in which Nash was the sender, but these are entries 5, 26, and 28. [57-1] 3, 9.

The Court recognizes that "the task of describing the basis for the privilege with sufficient detail yet without disclosing what the legal advice actually was" can be difficult. *Washtenaw Cnty.*, 2020 WL 3977944, at *3. But descriptions that are too "vague and generic" will not suffice. *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 218 (N.D. Ill. 2013). Thus, "[d]ocument descriptions like 'reflecting request for legal advice' do not make out a claim of attorney-client privilege." *McGee*, 2017 WL 1232616, at *2; *Washtenaw Cnty.*, 2020 WL 3977944, at *4 ("Had [the defendant] described this item only as 'the circulation of legal advice,' then yes, the Court might need to exercise its discretion, either to order a supplemental privilege log or to engage in an *in camera* review.").

Here, the emails solely between United's non-lawyer employees require a more detailed description. The emails are described as, "Email correspondence at the direction of counsel sought in order to provide legal advice." [57-1] 8 (entries 23 & 24). While the Court can surmise the topic(s) about which legal advice was sought, based on the surrounding descriptions in the log, it is United's burden to make and sustain a claim of privilege on a document-by-document basis, and it must do so for these documents as well. *Towne Place Condo. Ass'n v. Phila. Indem. Ins. Co.*, 284 F. Supp. 3d 889, 894 (N.D. Ill. 2018) (citing *White*, 950 F.2d at 430). These descriptions require more, consistent with the other descriptions in United's log. They must provide more detail as to the specific matters about which legal advice was sought without disclosing matter itself privileged. The Court underscores, however, that "direct

14

lawyer involvement is not required for the privilege to attach." *Crabtree*, 2017 WL 4740662, at *2.

*Second*, Wier suggests that emails on which in-house counsel is copied or is one of multiple recipients cannot be privileged. It is true that "[m]erely communicating with a lawyer or copying a lawyer on an otherwise non-privileged communication, will not transform the non-privileged communication or attachment into a privileged one." *Towne Place Condo. Ass'n*, 284 F. Supp. 3d at 895; *see also Washtenaw Cnty.*, 2020 WL 3977944, at *5 ("[A] non-privileged communication containing business advice or information, or containing something other than legal advice, does not suddenly become cloaked with the privilege simply because the sender chose to copy an in-house lawyer on it.") (citing *Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 161 (N.D. Ill. 2020)).

The Court finds that United has carried its burden and appropriately designated as privileged the communications on which in-house counsel is copied or is one of multiple recipients. These emails indicate that the non-attorney employees were seeking legal advice regarding "suspicions of FMLA abuse," "approval of absences in light of suspicious documentation," "Wier's absences," and "absences in light of suspicious paperwork." [57-1] 2–9 (entries 1–2, 4, 6–22, 25, and 27). These are "terms of art well-known to the parties in this litigation, as they go to the heart of some of the key disputes in the litigation." *Washtenaw Cnty.*, 2020 WL 3977944, at *4. The descriptions are self-evident, and bear on the core issues in the parties' dispute. United's employees collected information to assist in-house counsel Nash

15

with rendering legal advice about Wier's suspected FMLA abuse and the legal ramifications of her conduct. As in *Crabtree*, "employees collected facts that presumably relied on Defendant's confidential information and those facts were eventually channeled to counsel to aid in the provision of legal services." 2017 WL 4740662, at *2; *Upjohn*, 449 U.S. at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.").

Wier's challenge to the privileged nature of these emails appears to be based on mere speculation. At the motion hearing, Wier's counsel stated that employers will often copy their attorneys as a way to support a claim of privilege and "that's probably what's going on here." [90] 14. Counsel also argued that copying an attorney on an email runs counter to the notion of soliciting the attorney's advice. [*Id.*] 15, 29, 32–33. The Court will not cast doubt onto the privilege log descriptions based on counsel's speculation. Wier's counsel maintained that there is not "any allegation, any statement, any documentary proof, any anything to suggest that these emails, these communications at issue were created for the purpose of providing an attorney the requisite facts upon which he would base his legal opinion." [*Id.*] 27–28. To give credence to Wier's concerns would require the Court to "find that the otherwise adequate descriptions are simply disingenuous [when t]he Court has not been presented with a basis for such a finding and does not so find." *Washtenaw Cnty.*, 2020 WL 3977944, at *5. The Court declines to do so.

16

*Third*, Wier claims that there is no evidence that the emails sent by in-house counsel Nash were "responding to a prior confidential communication seeking legal advice." [57] 6. Wier states that this is based on an email chain produced by United, which is not contained in the record before the Court. [*Id.*]. Of the documents at issue, there are three emails from in-house counsel, dated September 26, 2017, October 17, 2017, and November 2, 2017.[10] [57-1] 3, 9. At the motion hearing, Plaintiff's counsel took issue with the fact that the first email on United's log is dated August 25, 2017, and the first email sent by Nash did not appear until September 26, 2017. [90] 29–30. From this, Plaintiff's counsel infers that Nash could not have been providing legal advice, as a diligent in-house attorney would have responded earlier. [*Id.*]. The Court declines to make this leap or read a temporal limitation into the elements for establishing a privilege claim.

With respect to communications including Nash, the Court notes one additional deficiency in United's privilege log. Entry 50 states, "Descriptions of various privileged communications with counsel seeking legal advice, including some of the communications listed above." [57-1] 14. While it appears that at least some of the spreadsheet descriptions incorporated in this entry correspond with other entries on United's privilege log (as indicated in entry 50's description), the information provided in this entry is insufficient. United is ordered to create six separate log

---

[10] At the hearing, the Court observed—and United's counsel confirmed—that entries 5 and 28 erroneously state that the emails were "seeking" as opposed to "providing" legal advice, where Nash was the sender. [90] 19–21.

entries for these descriptions and identify which entries, if any, are duplicative of other documents listed on the log. In drafting these new entries, United shall include specificity commensurate with the other descriptions in its log (with the exception of entries 23 & 24, as discussed above).[11]

*Finally*, Wier also argues that the log descriptions indicate that United's employees were seeking business, not legal, advice. Courts in this district have recognized, as does this Court, that the distinction between what constitutes business advice and legal advice "is often not an easy one to make." *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 326 F.R.D. 176, 181 (N.D. Ill. 2018). Communications involving in-house counsel may "pose challenges, because business advice and legal advice may become intertwined, and for the communication to fall within the privilege, the legal advice must predominate within that communication." *Washtenaw Cnty.*, 2020 WL 3977944, at *2 (citing *BankDirect Cap.*, 326 F.R.D. at 181). Doubtless there are myriad decisions in which the facts dictate one outcome or the other based on the issues presented in those cases. Any party, should they so choose, could easily string cite half a dozen to its liking. [73-1] 3–6. None of those cases would serve to alter the facts in the instant case, however. And the Court must consider the facts before it.

"A matter committed to a professional legal adviser is prima facie so committed for the sake of legal advice and is therefore within the privilege unless it appears to

---

[11] The Court also finds that the log description for entry 3 (an attachment) indicates that the privilege designation has been appropriately made.

18

be lacking in aspects requiring legal advice." *Crabtree*, 2017 WL 4740662, at \*2 (quoting *Weeks v. Samsung Heavy Indus., Ltd.*, No. 93 C 4899, 1996 WL 288511, at \*2 (N.D. Ill. May 30, 1996)). Wier claims that the disputed entries appear to be like those in *Smith v. Board of Education of City of Chicago*, No. 17 C 7034, 2019 WL 2525890 (N.D. Ill. June 19, 2019). In *Smith*, the disputed emails contained exchanges between an attorney, who also held a position within the Board's Office of Employee Engagement (apparently a type of human resources group), and other members of the Board's management. *Id.* at \*1–2. After conducting an *in camera* review, the court concluded that the communications concerned business activities, such as placing the plaintiff on a performance improvement plan and ultimately terminating her, and that the emails reflected the attorney was acting in her non-legal capacity rather than as a legal advisor. *Id.* at \*2–3. That is not the case here. There is no evidence in the record before the Court that in-house counsel Nash wears two hats as the attorney in *Smith* did, or that United non-legal employees, managers, or supervisors looped in Nash for routine discipline issues.[12] The log entries instead indicate consultation for the purpose of determining whether Wier's leave practices ran afoul of the FMLA (a legal question).[13]

---

[12] Certain log entries are described as "seeking legal advice regarding Wier's absences." [57-1] 7, 9. The Court recognizes that, in a vacuum, such descriptions could reflect routine personnel or disciplinary matters. This case involves more than that. Given the central role of potential FMLA abuse (the interpretation of which is statutory), the Court finds that this description does not reflect routine discipline issues.

[13] Wier adds that "[i]t is important to note that not one communication includes the standard phrase 'attorney/client privilege.'" [57] 5. But labeling or *not* labeling a document "attorney-client privileged" does not decide the issue. "Throughout the law, it is beyond debate that labels do not control; substance does. Questions relating to the attorney-client privilege are not an exception to this basic principle." *Towne Place Condo. Ass'n*, 284 F. Supp.

## B. Made in Confidence[14]

As explained above, the Court's analysis is guided by federal privilege law. The bulk of Wier's arguments is predicated on application of Illinois privilege law. [57] 6–10. The Court does not address any such arguments.

Wier claims that the communications were not made in confidence and thus are not entitled to protection as privileged. The wide dissemination, Wier contends, reaches too many employees—including a group email for the Operations Center Medical Department ("OPCMD"). [57] 10. United states that the number of people on the email chain does not affect the privilege, and the email recipients—including the OPCMD employees—were simply gathering information as part of their job duties in order to ultimately provide the information "required to enable [Nash] to render legal advice." [68] 10–11.

The email communications were made in confidence despite the inclusion of multiple United employees. The attorney-client privilege extends to internal corporate communications between employees and counsel "at the direction of corporate superiors regarding matters within the scope of the employee's duties for the purpose of securing legal advice." *Washtenaw Cnty.*, 2020 WL 3977944, at *2 (citing *Upjohn*, 449 U.S. at 394). Counsel need not be a sender or recipient, provided the communications "reveal, directly or indirectly, the substance of a confidential

---

3d at 897 (citations omitted).

[14] Wier appears to argue both (or in the alternative) that the emails were not privileged in the first instance because they were "not made in confidence"; and/or that even if an email would have been privileged, United waived that privilege by broadly disseminating the emails. [57] 2, 6, 10.

attorney-client communication." *Id.* (quoting *Crabtree*, 2017 WL 4740662, at *2). "[I]t is well settled that the dissemination of a communication between a corporation's lawyer and an employee of that corporation to those employees directly concerned with such matter does not waive the attorney-client privilege." *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1995 WL 557412, at *1 (N.D. Ill. Sept. 19, 1995) (quoting *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454, 456 (N.D. Ill. 1974), *aff'd*, 534 F.2d 330 (7th Cir. 1976)). "[T]he privilege must apply broadly enough within a corporation to give the privilege meaning," because "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Washtenaw Cnty.*, 2020 WL 3977944, at *2–3 (quoting *Upjohn*, 449 U.S. at 393).

Wier attacks United's assertion that these communications are confidential (or claims that any confidentiality that might have existed was subsequently waived) on two fronts: (1) we cannot know whether the employees were "directly concerned" absent prior case law defining the term; and (2) no evidence exists to indicate that the employees communicated "at the direction of their superiors." [57] 10. Neither attack is availing.

First, the named employees included on the emails at issue were directly concerned with the matter of Wier's potential FMLA abuse. Far from "shed[ding] no light," as Wier contends [*id.*], both a plain reading of the phrase and the United States Supreme Court provide sufficient markers for this Court to conclude the named employees included on the emails were personnel directly concerned with the relevant

21

issues (*i.e.*, FMLA leave and fact-gathering regarding any abuse thereof). Mapping this case onto *Upjohn*'s language, these employees provided "[i]nformation, not available from upper-echelon management, [that] was needed to supply a basis for legal advice concerning compliance with [FMLA laws, related company policies], and potential litigation in each of these areas." 449 U.S. at 394. It would be difficult indeed to imagine a group of employees at United—managers/supervisors, human resources personnel, and the Employee Services Center (responsible for FMLA administration)—more directly concerned with such an undertaking.

Additionally, the inclusion of the OPCMD email address on certain emails does not negate the privilege. Eleven entries on United's log include the OPCMD email address: 14, 15, 16, 17, 18, 19, 20, 22, 27, 28, and 29. [57-1]. Wier states that "various people" added summaries of communications to a document accessed by more than a dozen people "and likely accessible to that entire department of people," thus destroying any claim of privilege. [57] 9–10. In support, she cites *Muro v. Target Corp.*, 243 F.R.D. 301, 307 (N.D. Ill. 2007) for the proposition that privilege could not apply to emails distributed among "at least ten employees." [57] 9–10. Unfortunately for Wier, Target objected to the portion of the *Muro* decision she cites, and the district court sustained Target's objection, undermining the very proposition Wier claims supports her position. *Muro v. Target Corp.*, 250 F.R.D. 350, 364–65 (N.D. Ill. 2007), *aff'd*, 580 F.3d 485 (7th Cir. 2009) ("*Muro II*"). In *Muro II*, the court stated,

> There is no rule of law, however, that puts a numerical upper limit on the number of corporate employees who can be within the sphere of privilege. Rather, privilege can extend to any employee who communicates with counsel at the direction of her superiors, regarding

> matters within the scope of her duties. Nor need this be a small group;
> in *Upjohn,* for instance, communications with eighty-six corporate
> employees were held to be within the scope of a potential privilege.

*Id.* (citing *Upjohn*, 449 U.S. at 394–95). *Muro II* did take issue, however, with distribution lists that contained *unidentified* personnel, leaving "no way for an opposing party to assess whether they are within the sphere of corporate privilege." *Id.* at 364. This is not an issue in the instant case, as all parties—including each person working in OPCMD—are identified. [68] 3–4, 20, ¶ 11. This Court is also satisfied that the OPCMD personnel likewise were directly concerned with administration and recordkeeping as it related to Wier's FMLA leave.

Regarding Wier's second line of attack, the Court also finds that United has sufficiently established that the employees communicated at the behest of their superiors. As the Seventh Circuit concluded in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 491–92 (7th Cir. 1970), *aff'd*, 400 U.S. 348 (1971), "It is clear that we are not dealing in this case with the communications of employees about matters as to which they are virtually indistinguishable from bystander witnesses; employees who, almost fortuitously, observe events which may generate liability on the part of the corporation." So too here. Wier seeks an overly formalistic interpretation of the need for employee communications to be at the direction of corporate superiors—that each communication must essentially demonstrate some tether to a specific order from an identified superior. This interpretation would effectively grind modern business communications to a halt when dealing with a similar situation, and it cannot be the intent of the rule. The log, coupled with the

additional background information United has provided in its opposition, sufficiently indicates that the United employees involved in the communications at issue were no mere "bystander witnesses" and communicated "at the direction of [their] corporate employer and on its behalf." *Id.*

In summary, the Court finds that United has appropriately designated as privileged the majority of the disputed entries. As discussed above, the purely employee-to-employee entries (entries 23 & 24), as well as entry 50, contain insufficient descriptions for the Court to determine that the privilege designations have been properly made and should be revised according to the Court's instructions above.[15]

## II. Waiver

Wier argues that by asserting two affirmative defenses, United put these communications at issue and thus waived privilege. Wier also claims that United waived privilege as to one document, UNITED000177, by producing it.

### A. Affirmative Defenses

Wier argues that United has waived any privilege by asserting two affirmative defenses. First, Wier points to United's Second Affirmative Defense, which states, "All actions taken by United were made without malice, in good faith, and for legitimate, non-discriminatory and non-retaliatory reasons. Such good faith and legitimate reasons are a complete defense to Plaintiff's allegations and further

---

[15] In addition, as addressed at the motion hearing, the Court expects United to add "Attorney-Client Privileged" to entry 25 of the log, which is an email contained in UNITED000177, as defense counsel confirmed that this was inadvertently left out of the "Basis for Privilege" column. [90] 4–5.

preclude recovery of punitive damages." [15] 22. Second, Wier points to United's Fourth Affirmative Defense, which states,

> To the extent Plaintiff complained to United about any alleged unlawful treatment, United took immediate and adequate steps to investigate and address Plaintiff's complaints. United exercised reasonable care to prevent and correct promptly any alleged retaliatory behavior that Plaintiff reported, including disseminating a formal policy against retaliation, complying with those policies, promptly responding to Plaintiff's alleged complaints, conducting an investigation regarding her complaints, and providing another avenue for her to seek redress. Additionally, Plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by United or to avoid harm otherwise.

[*Id.*] 23. Based on these affirmative defenses, Wier claims that "information regarding the actions Defendant took to fire [her], including its investigation into her use of FMLA leave" have been put "at issue," thus waiving any privilege attached to evidence relating to these defenses. [57] 13.

Wier is mistaken. Although United failed to direct this Court to relevant case law supporting its position, Wier's waiver argument is incorrect, and the cases upon which she attempts to rely are inapposite. [*Id.*]. Courts in this district have adopted the Third Circuit's approach to the "at issue" waiver doctrine. *See Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 216 (N.D. Ill. 2001); *United States ex rel. Derrick v. Roche Diagnostics Corp.*, No. 14 CV 04601, 2019 WL 1789883, at *2 (N.D. Ill. Apr. 24, 2019); *Cage v. Harper*, No. 17-CV-7621, 2019 WL 6911967, at *1 (N.D. Ill. Dec. 19, 2019).[16] "In *Rhone–Poulenc,* the Third Circuit specifically rejected

---

[16] As the court in *Cage* explained, "The Seventh Circuit has not addressed directly the federal common law standard for when a party waives attorney-client privilege by putting privileged information 'at issue' in a case. However, in *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995), the Seventh Circuit cited the standard adopted by the

the proposition that a party impliedly waives the privilege merely by asserting a defense that would make an attorney's advice relevant." *Beneficial Franchise*, 205 F.R.D. at 216. "Rather, the Third Circuit held that 'the advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication.'" *Id.* (citing *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994)).

United is not attempting to put its attorney's advice at issue in this case. Wier conflates the production of facts (to which she is entitled) to the production of related confidential attorney-client communications (to which she is not). *See Roche Diagnostics*, 2019 WL 1789883, at *4 (noting that a defendant "is entitled to attempt to prove its affirmative defenses using non-privileged evidence without sacrificing its attorney-client communications"). Were this Court to hold otherwise, "then any party asserting a claim or defense on which it bears the burden of proof would be stripped of its privilege and left with the draconian choice of abandoning its claim and/or defense or pursuing and protecting its privilege." *Beneficial Franchise*, 205 F.R.D. at 217.

Additionally, Wier seems to argue that because United has produced some documents and not others from the same time period, it must be improperly withholding materials. [57] 14. Wier offers nothing to support this theory beyond conjecture and speculation. That United produced some documents at or around the

---

Third Circuit in *Rhone-Poulenc*. As a result, district courts within this circuit have applied the *Rhone-Poulenc* standard." *Cage*, 2019 WL 6911967, at *1.

same time as others on its privilege log reflects nothing improper on its face, and in fact is often how email productions transpire.

## B. Inadvertent Disclosure

Wier also argues that United waived any privilege as to UNITED000177. [*Id.*] 10–12. United responds that it inadvertently produced the document but did not waive privilege. [68] 12–14.

On March 25, 2020, United produced 543 pages of documents as part of its Mandatory Initial Discovery Pilot Project responses. [57] 11; [68] 12, 23. In August 2020, United responded to Wier's document production requests, referring to its initial document production. [57] 11. Following a meet-and-confer discussion on December 22, 2020, Wier's counsel sent United a letter regarding that discussion and noting that Wier "planned on relying on a subject-matter waiver argument based on UNITED000177," which United had included in its production. [*Id.*] 3, 11. The following day, United served a claw-back letter, explaining that based on Wier's counsel's letter, it had become aware that the document was inadvertently included in its initial production. [68] 4, 23. United's counsel stated that it was "disappointed" that Wier had apparently received the document in United's initial production in March 2020, "but remained silent about it for 9 months." [*Id.*] 23. United simultaneously produced a revised version of the document with redactions covering the two emails, as well as a Third Amended Privilege Log adding the document, and demanded that Wier and her counsel "immediately destroy all previously produced copies." [*Id.*] 24.

27

Federal Rule of Evidence 502(b) governs inadvertent disclosures of privileged material in federal proceedings. The rule provides that a disclosure of privileged information does not operate as a waiver if: "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." FRE 502(b). "The producing party bears the burden of showing compliance with Rule 502." *Viamedia, Inc. v. Comcast Corp.*, No. 16-cv-5486, 2017 WL 2834535, at *5 (N.D. Ill. June 30, 2017) (quoting *Excel Golf Prods., Inc. v. MacNeil Eng'g Co.*, No. 11 C 1928, 2012 WL 1570772, at *2 (N.D. Ill. May 3, 2012)).

As an initial matter, the Court must determine whether the two emails are subject to the attorney-client privilege. *Pilot v. Focused Retail Prop. I, LLC*, 274 F.R.D. 212, 215 (N.D. Ill. 2011) (citing *Heriot*, 257 F.R.D. at 655). The first email is from a Human Resources employee, Laurie Ledonne, to Carlos Rivera Torres, ESC Manager, copying Nash along with two managers/supervisors. At the motion hearing, Wier's counsel argued that the email does not request legal advice, merely "fact advice" or "fact information" from a non-lawyer and is "simply and very clearly a standard HR communication." [90] 8. Counsel also noted that Nash was only copied on the email. [*Id.*]. The second email is Nash's response, which Wier claims to be business—not legal—advice. [57] 11 n.6; [90] 11–12.

The Court is unpersuaded by Wier's arguments. Ledonne's email does more than seek facts. Indeed, contrary to Wier's counsel's suggestion at the motion hearing

28

that there is nothing to indicate that the investigation and collection of information was done to provide facts for Nash to provide legal advice, the language of this email indicates that such facts were in aid of a legal conclusion from Nash. *Upjohn*, 449 U.S. at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."). As defense counsel pointed out in the hearing, the fact that Nash responded to Ledonne's email—within five minutes— belies Wier's counsel's suggestion at the hearing that Nash's response was "completely non-responsive and voluntary." [90] 10–12.

Nash's email in response constitutes legal advice. The Court recognizes that the line between business advice and legal advice can be difficult to draw, but wherever the line is drawn, this email will fall on the legal side of it. Nash's guidance expressly addresses the legality of Wier's conduct, which Nash determined to violate the FMLA.

Having determined that the emails are protected by the attorney-client privilege, the Court applies the tri-part test of Rule 502(b) to determine whether United's disclosure of the emails operates as a waiver. To begin, Wier does not contest that the production was inadvertent, and there is no indication that United intended to waive the privilege or to produce the two emails in any case. *Carmody v. Bd. of Trs.*, 893 F.3d 397, 406 (7th Cir. 2018) (citing *Viamedia*, 2017 WL 2834535, at *6). The Court finds that the production of the two emails was inadvertent.

The Court next determines whether United took reasonable steps to prevent the disclosure. Wier argues that United cannot satisfy this factor, pointing to: (1) the size of the production; and (2) the fact that United did not include the emails in prior versions of its privilege log. [57] 11–12. Prior to the passage of Rule 502(b), courts used a "balancing approach" that required consideration of several factors, including the scope of discovery, to assess whether privilege had been waived. *Kmart Corp. v. Footstar, Inc.*, No. 09 C 3607, 2010 WL 4512337, at *3 (N.D. Ill. Nov. 2, 2010) (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 387–88 (7th Cir. 2008)); *Carmody*, 893 F.3d at 406 n.2 ("Before Rule 502 was adopted, [the Seventh Circuit] addressed waiver by inadvertent disclosure by considering '(1) the reasonableness of the precautions taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness.'") (quoting *Judson Atkinson Candies*, 529 F.3d at 388). Courts continue to rely on those factors for guidance in determining whether a party has taken reasonable steps to avoid disclosure under Rule 502(b)(2). *Kmart Corp.*, 2010 WL 4512337, at *3–4; *Coburn Grp., LLC v. Whitecap Advisors, LLC*, 640 F. Supp. 2d 1032, 1038 (N.D. Ill. Aug. 7, 2009); *Carmody*, 893 F.3d at 406 n.2 (noting that "the advisory committee notes [to Rule 502] endorsed the factors in *Judson Atkinson Candies*"). The Judicial Conference Rules Committee explains that "the rule does not explicitly codify that [multi-factor]-test, because it is really a set of non-determinative guidelines that vary from cases to case. . . . [C]onsiderations bearing on the reasonableness of a producing party's efforts include the number of documents

to be reviewed and the time constraints for production." Rule 502 comm. explanatory n. (2007). "Depending on the circumstances, a party that uses advanced analytical software applications and linguistic tools in screening for privilege and work product may be found to have taken 'reasonable steps' to prevent inadvertent disclosure." *Id.*

United provided over 1,000 pages of potentially responsive documents to its counsel, from which 543 pages were ultimately produced. [68] 13, 26, ¶ 3. It is true that the number of documents United reviewed (and ultimately produced) falls "toward the modest end of the spectrum in modern discovery practice." *Carmody*, 893 F.3d at 405–06 (affirming district court's finding that the defendant did not waive privilege where one out of hundreds of documents produced—and thousands reviewed—was included in the party's production). Wier cites *Pilot v. Focused Retail Property I, LLC*, 274 F.R.D. 212 in support of her argument that the size of United's production supports waiver. [57] 11. The waiver outcome in that decision, however, did not rest solely on the size of the production, as Wier suggests.

As to United's review procedures, United's counsel, Sabreena El-Amin, provided a declaration explaining that she reviewed the 1,000 pages provided by United, and, during her initial review, El-Amin "isolated pages to be withheld in their entirety based on privilege and marked potential redactions for partially privileged pages." [68] 26, ¶¶ 3–4. Furthermore, El-Amin stated that, "[a]s a best practice," she would complete this process by printing documents received from the client and using sticky notes and a marker to manually identify privileged communications. [*Id.*] 26, ¶ 5. El-Amin explained that she was forced to deviate from this normal practice and

31

instead complete her initial review and privilege marking electronically when her firm "suddenly and unexpectedly" transitioned to remote work in response to the COVID-19 pandemic on March 16, 2020. [*Id.*] 26, ¶¶ 6–7. Due to that transition, El-Amin did not have access to the resources of her office, including a printer, copier, scanner, and other office supplies that she uses in document productions. [*Id.*] 27, ¶ 7. Instead, El-Amin used an electronic redaction tool to mark the location of partially privileged documents within the production. [*Id.*] 27, ¶ 8. The redaction marker for UNITED000177 was not saved, "presumably due to a technological glitch or accidental deletion," and the document was not "flagged" when El-Amin created United's privilege log based on the draft markers. [*Id.*] 27, ¶ 9. UNITED000177 was thus produced without redactions and without being included on United's privilege log on March 25, 2020. [*Id.*] 27, ¶ 10.

The Court finds that United took reasonable measures to prevent disclosure. Ordinarily, the Court would have welcomed—and perhaps required—additional information, such as the length of time in which United completed its production and a description of any screening processes that were used. But the Court's analysis cannot be conducted through an ordinary lens. As explained above, United's production was made on the heels of its counsel's transfer to remote work amidst the outbreak of a global pandemic. That United allowed a single page to slip through the cracks in its mid-March 2020 document production is understandable under the circumstances, and the "overriding issue of fairness" thus weighs against a finding of waiver. Rule 502 comm. explanatory n. (2007). Additionally, considering how this

32

single page was inadvertently produced, it stands to reason that the document would not end up on the privilege log prior to United being notified of the production, despite Wier's claims to the contrary. [57] 12. Thus, the fact that the Seventh Circuit noted that the inclusion of an inadvertently produced document on a party's privilege log reflected diligence would not come into play in these circumstances (regardless, the inverse circumstance—lack of inclusion on a log—does not necessarily reflect a lack of diligence, since the underlying facts vary from case to case). *See Carmody*, 893 F.3d at 406.

Finally, although Wier does not expressly contest that United promptly took reasonable steps to rectify its error, she claims that "[t]he length of time between the production and the claw-back attempt weighs against Defendant." [57] 12. Specifically, Wier claims that the ten-month time period between United's production and its claw-back attempt supports waiver, pointing to a case in which "[t]his court found three months to be too long." [*Id.*] 12 (citing *Central Die Casting & Mfg. Co. v. Tokheim Corp.*, No. 93 C 7692, 1994 WL 444796, at *5 (N.D. Ill. Aug. 15, 1994)). In *Central Die*, the court found that "the time taken to rectify the error weigh[ed] in favor of [the party claiming waiver]." *Id.* Wier correctly states that the time period between production and rectification in that case was three months. But the court in *Central Die* did not consider the time period in a vacuum. Rather, the court's holding was informed by the fact that, during that three-month period between production and rectification, the opposing party had incorporated the document into a motion for summary judgment. The court stated that although the party had moved quickly to

rectify the error upon discovery of the inadvertent production, the document had been "produced to plaintiff without restriction, duplicated, disseminated, and incorporated into [plaintiff's] motion for summary judgment." *Id.* The court noted that the bell had been rung, and it could not un-ring it. *Id.* This Court faces no such hurdle.

Regardless, as United correctly points out in its opposition, the time to rectify the error begins from the producing party's discovery of the inadvertent production— not production. Before Rule 502 was adopted, "courts in this circuit looked to the time between a party's learning of the disclosure and that party's taking action to remedy it, rather than the time that elapsed since the document was placed in the hands of the other party." *Coburn Grp.*, 640 F. Supp. 2d at 1041 (citing *Judson Atkinson Candies*, 529 F.3d at 389 and *United States v. Nat'l Ass'n of Realtors*, 242 F.R.D. 491, 495 (N.D. Ill. 2007)). Courts continue to use this approach. *Walker v. White*, No. 16 C 7024, 2018 WL 2193255, at *4 (N.D. Ill. May 14, 2018). Indeed, the *Pilot* case cited by Wier in her motion explains, "[C]ourts focus on the producing party's response after it realizes that it has disclosed privileged material." *Pilot*, 274 F.R.D. at 217 (citing *Coburn Grp.*, 640 F. Supp. 2d at 1041). Furthermore, commentary from the Judicial Conference Rules Committee supports this view: "The rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake. But the rule does require the producing party to follow up on any obvious indications that a protected communication or information has been produced inadvertently." Rule 502 comm. explanatory n. (2007).

There is no dispute that United was unaware that UNITED000177 had been produced without redactions until Wier's counsel sent the December 22, 2020 letter notifying United that Wier intended to rely on the document in a forthcoming motion to compel. The next day, United's counsel requested that Wier and her counsel immediately destroy all previously produced copies of the document within their possession and cease any attempt to unfairly use it in this case. [68] 23–24. Indeed, United's counsel noted in its letter that it would address other issues that were raised in Plaintiff's counsel's December 22, 2020 letter "under separate cover but wanted to promptly address this serious issue immediately." [*Id.*] 24 n.1. United's response was prompt. *See, e.g.*, *Heriot*, 257 F.R.D. at 662 (finding that plaintiffs took "prompt steps to rectify their inadvertent disclosure" where notice of disclosure was given within twenty-four hours of discovery); *Coburn Grp.*, 640 F. Supp. 2d at 1041 ("no delay" in trying to rectify its error where party requested document's return one day after learning it had been produced). United has shown that it took prompt, reasonable steps to rectify the disclosure.

The Court finds that United did not waive attorney-client privilege for UNITED000177. One ancillary topic warrants brief discussion. Wier states in her motion that United "tries to blame Plaintiff for its own error" in producing the document. [57] 11–12 n.6. Wier claims that she had no obligation to bring United's production of the document to its attention because the document is not privileged, and at the motion hearing, her counsel indicated that its non-privileged nature is apparent on its face. [*Id.*]; [90] 8–10. The document must have raised at least a mild

warning flag, however, for Wier's counsel to have brought it to United's attention instead of simply attaching it to Wier's filing.[17] To now suggest that United lacked good faith in its admonishment of Wier for failing to mention the document for a period of several months rings hollow.

### III. *In Camera* Review

Wier argues that the Court should "resolve any doubts through *in camera* review." [57] 14.

To be sure, *in camera* inspections have become increasingly common. Edna Epstein, Attorney-Client Privilege & the Work-Product Doctrine 3.III.J, at 1, 4, 12 (6th ed. 2017) (explaining that *in camera* review has become "ubiquitous," "routine," "legion," and "exceedingly common"). That does not mean that an *in camera* review should be granted as a default. "Plaintiff is not entitled to an *in camera* review simply because [s]he requested one." *Crabtree*, 2017 WL 4740662, at *3; Epstein, *supra*, at 2 ("At times it appears that *in camera* inspections of documents for privilege purposes have become so common that litigants almost expect that is the way it must be done. Yet if one is serious about the privilege, then courts should not be expected, as a matter of course, to inspect all documents as to which a privilege claim is made.").

"[U]ltimately the question of whether to engage in an *in camera* review lies within the Court's discretion." *Washtenaw Cnty.*, 2020 WL 3977944, at *3. Courts in this district have declined to conduct an *in camera* review absent a "well-founded

---

[17] While the Court does not have Wier's counsel's December 22, 2020 letter before it, United's opposition brief includes quoted language from the letter. That excerpt indicates that Wier's counsel characterized UNITED000177 as including an email in which in-house counsel Nash "advise[d]" United. [68] 12 n.5.

basis for challenging [the other side's] privilege designations." *Crabtree*, 2017 WL 4740662, at *3; *see also Washtenaw Cnty.*, 2020 WL 3977944, at *4 ("The log descriptions at issue here adequately indicate that the communications concern 'legal' matters, and *in camera* review is not suggested by anything other than Plaintiffs' speculation that the communications are of a business or non-legal nature. This is an insufficient basis for *in camera* review.") (citation omitted). As explained above, the Court finds no such basis here.

Wier claims that *in camera* review is "especially appropriate" where, as here, the volume of documents is "nominal"—a point Wier's counsel reiterated at the motion hearing. [57] 15; [90] 33–34, 35. In support, Wier cites *BPI Energy, Inc. v. IEC (Montgomery), LLC*, No. 07-186, 2008 WL 4225843 (S.D. Ill. Sept. 12, 2008), where the Court held that it would conduct an *in camera* review of 157 documents involving an individual who was both general counsel and the sole officer of certain defendant companies. Under the circumstances, the court found that the communications needed to be "closely scrutinized" to distinguish the individual's business communications from his legal communications, but the defendants' privilege log, which the court found to be "vague, conclusory, and [having] a boilerplate quality," failed to provide sufficient information to enable the court to assess the applicability of the privilege. 2008 WL 4225843, at *4. That is not the case here.

Courts in this district have cautioned against resorting to an *in camera* review on the basis of the review size. *See, e.g., Washtenaw Cnty.*, 2020 WL 3977944, at *3 (declining to review *in camera* seventy-five documents and explaining, "the Court

ought not to engage in an *in camera* review of even a manageable number of documents if the review is not warranted") (citing *Crabtree*, 2017 WL 4740662, at *1, 3, 7). This Court is loath to establish what would amount to an arbitrary numerical floor triggering *in camera* review. Whether 10 or 10,000 documents are at issue, the volume should not dictate a "default" *in camera* status. The additional cases Wier cites ([57] 14–15) do not demand a contrary result and recognize that the inquiry is fact intensive.

The Court understands that, where *in camera* review is denied, the door is left open to *some* level of metaphysical uncertainty. Indeed, "[t]he ultimate proof of privileged content is disclosure of the content itself. A privilege log, though, need only provide a form of penultimate proof, by way of a short summary statement that conveys at least a basis for the Court to believe that the content of the communication is privileged." *Washtenaw Cnty.*, 2020 WL 3977944, at *3. Else privilege logs would be a mere formality serving the sole purpose of providing the court with a document count so that it may determine whether *in camera* review of disputed documents was feasible or not. For the reasons explained above, the Court finds that *in camera* review is not warranted.

## Conclusion

Wier's motion to compel [57] is denied. United is ordered to amend its operative privilege log to conform with the above within seven days of this Order.

_____

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: April 16, 2021**

39